DA 09-0051

## IN THE SUPREME COURT OF THE STATE OF MONTANA

### 2009 MT 449

ROBERT BAXTER, STEPHEN SPECKART, M.D.,
C. PAUL LOEHNEN, M.D., LAR AUTIO, M.D.,
GEORGE RISI, JR., M.D., and
COMPASSION & CHOICES,

      Plaintiffs and Appellees,

   v.

STATE OF MONTANA and STEVE BULLOCK,

      Defendants and Appellants.


APPEAL FROM:   District Court of the First Judicial District,
                    In and For the County of Lewis and Clark, Cause No. ADV 07-787
                    Honorable Dorothy McCarter, Presiding Judge


COUNSEL OF RECORD:

      For Appellants:

            Hon. Steve Bullock, Montana Attorney General;
            Anthony Johnstone, Solicitor (argued); Jennifer Anders, Assistant
            Attorney General; Helena, Montana

      For Appellees:

            Mark S. Connell (argued); Connell Law Firm; Missoula, Montana

            Kathryn L. Tucker; Compassion & Choices; Portland, Oregon

      For Amici Curiae:

            Lance Lovell; Law Offices of Lance Lovell; Billings, Montana
            Paul Benjamin Linton; Special Counsel, Thomas More Society;
            Northbrook, Illinois
            Thomas Brejcha; President & Chief Counsel, Thomas More Society
            (*Physicians for Compassionate Care Education Foundation*)

            Nickolas C. Murnion; Nickolas C. Murnion Law Firm; Jordan, Montana
            Rita L. Marker; Attorney at Law; Steubenville, Ohio
            (*International Task Force on Euthanasia & Assisted Suicide, et al.*)

Duane T. Schmidt, Attorney at Law; Alliance Defense Fund;
Scottsdale, Arizona
Steven H. Aden, (of Counsel); Matthew S. Bowman (of Counsel);
Alliance Defense Fund; Washington, District of Columbia
(*Family Research Council, et al.*)

Patrick Flaherty, Attorney at Law; Great Falls, Montana
Daniel Avila; Attorney at Law; Everett, Massachusetts
(*Institute for the Study of Disability & Bioethics, et al.*)

Jon Metropoulos; Gough, Shanahan, Johnson, & Waterman, PLLP;
Helena, Montana
Mailee R. Smith; Attorney at Law; Chicago, Illinois
(*Coalition of 28 Bipartisan Montana Legislators*)

Margaret K. Dore; Law Offices of Margaret K. Dore, PS;
Seattle, Washington (*Supporting the Appellants*)

Donald Ford Jones; Hohenlole, Jones, PLLP; Helena, Montana
Stephen F. Gold; Attorney at Law; Philadelphia, Pennsylvania
(*Disability Amici Curiae – Not Dead Yet, ADAPT, Disability Rights
Education and Defense Fund, et al.*)

William P. Driscoll; Franz & Driscoll, PLLP; Helena, Montana
Maxon R. Davis; Davis Hatley Haffeman & Tighe, P.C.; Great Falls,
Montana (*Montana Catholic Conference*)

Timothy C. Fox; Gough, Shanahan, Johnson & Waterman, PLLP; Helena
Montana; Jeffrey J. Davidson; Wilmer, Cutler, Pickering Hale & Dorr
LLP; Washington, District of Columbia (*Christian Medical Association*)

Thomas A. Dooling, Beth Brenneman; Staff Attorneys, Disability Rights
Montana; Helena, Montana
Andrée Larose; Reynolds, Motl and Sherwood, PLLP; Helena, Montana
(*Disability Rights Montana*)

Peter Michael Meloy; Meloy Law Firm; Helena, Montana
Miles J. Zaremski; Zaremski Law Group; Northbrook, Illinois
(*American College of Legal Medicine in Support of Plaintiffs-Appellees*)

Scott A. Fisk; Crowley Fleck PLLP; Helena, Montana
Robert A. Free, Katherine C. Chamberlain; MacDonald Hoague &
Bayless; Seattle, Washington (*Surviving Family Members in Support of
Aid in Dying in Support of Plaintiffs-Appellees*)

Elizabeth L. Griffing; ACLU of Montana Foundation; Missoula, Montana
(*ACLU of Montana as Amicus Curiae in Support of Plaintiffs-Appellees*)

Byron W. Boggs; Attorney at Law; Missoula, Montana
David J. Burman, Kanika Chander; Perkins Coie LLP; Seattle, Washington
Jeremy L. Buxbaum; Perkins Coie LLP; Chicago, Illinois
(*Montana Legislators in Support of Privacy and Dignity in Support of Plaintiffs/Appellees*)

James G. Hunt, William E. Hunt, Sr.; Dix, Hunt & McDonald; Helena, Montana (*Religious Amici Curiae on Behalf of Baxter*)

Scott A. Fisk; Crowley Fleck PLLP; Helena, Montana
Nicholas W. van Aelstyn; Beveridge & Diamond, P.C.; San Francisco, California (*Legal Scholars Professors Larry M. Elison, Thomas P. Huff, and Erwin Chemerinsky et al.*)

Lee A. Freeman; Jenner & Block LLP; Chicago, Illinois
Michelle A. Groman, Nicholas O. Stephanopoulos; Jenner & Block LLP; Washington, District of Columbia (*Montana Bioethicists in Support of Plaintiffs-Appellees*)

Michael G. Black; Black Law Office; Missoula, Montana
Norman H. Beamer, Aaron S. Jacobs; East Palo Alto, California (*Montana Residents with Disabilities and Autonomy, Inc.*)

Karen Boxx, Professor; Seattle, Washington
Vanessa Soriano Power; Stoel Rives LLP; Seattle, Washington
(*Legal Voice, et al.*)

James H. Goetz; Goetz, Gallik & Baldwin, P.C.; Bozeman, Montana
Lesli A. Rawles; Covington & Burling LLP, San Diego, California
(*American Medical Women's Association, et al.*)

Paul J. Lawrence; K&L Gates LLP; Seattle, Washington
(*Montana Human Rights Network, The Billings Association of Humanists, et al.*)

_____

Argued:  September 2, 2009
Submitted:  September 3, 2009
Decided:  December 31, 2009

Filed:

_____
Clerk

3

Justice W. William Leaphart delivered the Opinion of the Court.

¶1    The State of Montana appeals from the Order of the First Judicial District Court granting summary judgment in favor of Robert Baxter, Stephen Speckart, M.D., C. Paul Loehnen, M.D., Lar Autio, M.D., George Risi, Jr., M.D., and Compassion & Choices; and from the District Court's decision that a competent, terminally ill patient has a right to die with dignity under Article II, Sections 4 and 10 of the Montana Constitution, which includes protection of the patient's physician from prosecution under the homicide statutes. We affirm in part and reverse in part.

¶2    We rephrase the following issues on appeal:

¶3    I. Whether the District Court erred in its decision that competent, terminally ill patients have a constitutional right to die with dignity, which protects physicians who provide aid in dying from prosecution under the homicide statutes.

¶4    II. Whether Mr. Baxter is entitled to attorney fees.

## BACKGROUND

¶5    This appeal originated with Robert Baxter, a retired truck driver from Billings who was terminally ill with lymphocytic leukemia with diffuse lymphadenopathy. At the time of the District Court's decision, Mr. Baxter was being treated with multiple rounds of chemotherapy, which typically become less effective over time. As a result of the disease and treatment, Mr. Baxter suffered from a variety of debilitating symptoms, including infections, chronic fatigue and weakness, anemia, night sweats, nausea, massively swollen glands, significant ongoing digestive problems and generalized pain and

discomfort. The symptoms were expected to increase in frequency and intensity as the chemotherapy lost its effectiveness. There was no cure for Mr. Baxter's disease and no prospect of recovery. Mr. Baxter wanted the option of ingesting a lethal dose of medication prescribed by his physician and self-administered at the time of Mr. Baxter's own choosing.

¶6 Mr. Baxter, four physicians, and Compassion & Choices, brought an action in District Court challenging the constitutionality of the application of Montana homicide statutes to physicians who provide aid in dying to mentally competent, terminally ill patients. The complaint alleged that patients have a right to die with dignity under the Montana Constitution Article II, Sections 4 and 10, which address individual dignity and privacy.

¶7 In December 2008, the District Court issued its Order and Decision, holding that the Montana constitutional rights of individual privacy and human dignity, together, encompass the right of a competent, terminally ill patient to die with dignity. The District Court held that a patient may use the assistance of his physician to obtain a prescription for a lethal dose of medication. The patient would then decide whether to self-administer the dose and cause his own death. The District Court further held that the patient's right to die with dignity includes protection of the patient's physician from prosecution under the State's homicide statutes. Lastly, the District Court awarded Mr. Baxter attorney fees. The State appeals.

**STANDARDS OF REVIEW**

¶8　We review an order granting summary judgment de novo using the same standards applied by the District Court under M. R. Civ. P. 56. *Bud-Kal v. City of Kalispell*, 2009 MT 93, ¶ 15, 350 Mont. 25, 30, 204 P.3d 738, 743. Where there is a cross-motion for summary judgment, we review a district court's decision to determine whether its conclusions were correct. *Bud-Kal*, ¶ 15. We review an award of attorney fees for abuse of discretion. *Trs. of Ind. Univ. v. Buxbaum*, 2003 MT 97, ¶ 15, 315 Mont. 210, 216, 69 P.3d 663, 667.

**DISCUSSION**

¶9　The parties in this appeal focus their arguments on the question of whether a right to die with dignity—including physician aid in dying—exists under the privacy and dignity provisions of the Montana Constitution. The District Court held that a competent, terminally ill patient has a right to die with dignity under Article II, Sections 4 and 10 of the Montana Constitution. Sections 4 and 10 address individual dignity and the right to privacy, respectively. The District Court further held that the right to die with dignity includes protecting the patient's physician from prosecution under Montana homicide statutes. The District Court concluded that Montana homicide laws are unconstitutional as applied to a physician who aids a competent, terminally ill patient in dying.

¶10　While we recognize the extensive briefing by the parties and amici on the constitutional issues, this Court is guided by the judicial principle that we should decline to rule on the constitutionality of a legislative act if we are able to decide the case without

6

reaching constitutional questions. *State v. Adkins*, 2009 MT 71, ¶ 12, 349 Mont. 444, 447, 204 P.3d 1, 5; *Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, ¶ 62, 338 Mont. 259, 279, 165 P.3d 1079, 1093. Since both parties have recognized the possibility of a consent defense to a homicide charge under § 45-2-211(1), MCA, we focus our analysis on whether the issues presented can be resolved at the statutory, rather than the constitutional, level.

¶11 We start with the proposition that suicide is not a crime under Montana law. In the aid in dying situation, the only person who might conceivably be prosecuted for criminal behavior is the physician who prescribes a lethal dose of medication. In that the claims of the plaintiff physicians are premised in significant part upon concerns that they could be prosecuted for extending aid in dying, we deem it appropriate to analyze their possible culpability for homicide by examining whether the consent of the patient to his physician's aid in dying could constitute a statutory defense to a homicide charge against the physician.

¶12 The consent statute would shield physicians from homicide liability if, with the patients' consent, the physicians provide aid in dying to terminally ill, mentally competent adult patients. We first determine whether a statutory consent defense applies to physicians who provide aid in dying and, second, whether patient consent is rendered ineffective by § 45-2-211(2)(d), MCA, because permitting the conduct or resulting harm "is against public policy."

¶13 Section 45-5-102(1), MCA, states that a person commits the offense of deliberate homicide if "the person purposely or knowingly causes the death of another human being . . . ." Section 45-2-211(1), MCA, establishes consent as a defense, stating that the "consent of the victim to conduct charged to constitute an offense or to the result thereof is a defense." Thus, if the State prosecutes a physician for providing aid in dying to a mentally competent, terminally ill adult patient who consented to such aid, the physician may be shielded from liability pursuant to the consent statute. This consent defense, however, is only effective if none of the statutory exceptions to consent applies. Section 45-2-211(2), MCA, codifies the four exceptions:

> Consent is ineffective if: (a) it is given by a person who is legally incompetent to authorize the conduct charged to constitute the offense; (b) it is given by a person who by reason of youth, mental disease or defect, or intoxication is unable to make a reasonable judgment as to the nature or harmfulness of the conduct charged to constitute the offense; (c) it is induced by force, duress, or deception; or (d) it is against public policy to permit the conduct or the resulting harm, even though consented to.

The first three statutory circumstances rendering consent ineffective require case-by-case factual determinations. We therefore confine our analysis to the last exception and determine whether, under Montana law, consent to physician aid in dying is against public policy. For the reasons stated below, we find no indication in Montana law that physician aid in dying provided to terminally ill, mentally competent adult patients is against public policy.

¶14 Section 45-2-211(2)(d), MCA, renders consent ineffective if "it is against public policy to permit the conduct or the resulting harm, even though consented to." We

8

addressed the applicability of this provision in *State v. Mackrill*, 2008 MT 297, 345 Mont. 469, 191 P.3d 451. This Court held that the consent of a victim is not a defense to the charge of aggravated assault under § 45-5-202(1), MCA. *Mackrill*, ¶ 33. The *Mackrill* decision, while not limiting the exception's reach, applied the "against public policy" exception to situations in which violent, public altercations breach public peace and endanger others in the vicinity. Physician aid in dying, as analyzed below, does not fall within the scope of what this Court has thus far identified as "against public policy."

¶15    The *Mackrill* case arose from a particularly violent altercation between Jason Mackrill and Robert Gluesing outside a Livingston bar. Mackrill, who had been drinking heavily, spent the better part of the evening disrupting other bar-goers, including Gluesing. When a bartender refused to serve Mackrill, Gluesing offered Mackrill a few dollars and encouraged him to go elsewhere. Mackrill became obstinate and refused to leave. When the bartender picked up the phone to call the police, Gluesing escorted Mackrill out of the bar. Once outside, Mackrill began punching Gluesing, including a "very solid shot" that caused Gluesing's feet to come off the ground and the back of his head to hit the pavement. A witness called 9-1-1 and paramedics arrived on the scene. They found Gluesing unconscious and bleeding in the street. He was transported to the hospital and treated for head injuries, including a skull fracture.

¶16    The State charged Mackrill with one count of aggravated assault, a felony under § 45-5-202, MCA. He pleaded not guilty and filed a Notice of Affirmative Defenses, in which he stated he would argue consent as a defense at trial. The jury found Mackrill

guilty. He then filed a post-trial motion claiming the State failed to introduce evidence upon which the jury could conclude Gluesing did not consent to the fight. After a hearing on the matter, the district court denied the motion. Mackrill appealed. This Court concluded that consent is not an effective defense against an assault charge under § 45-5-202(1), MCA. *Mackrill*, ¶ 33.

¶17 The *Mackrill* decision is the only Montana case addressing the public policy exception to consent. It demonstrates one set of circumstances in which consent as a defense is rendered ineffective because permitting the conduct or resulting harm is "against public policy." This "against public policy" exception to consent applies to conduct that disrupts public peace and physically endangers others. Clearly, under *Mackrill*, unruly, physical and public aggression between individuals falls within the parameters of the "against public policy" exception. The men were intoxicated, brawling in a public space, and endangering others in the process.

¶18 A survey of courts that have considered this issue yields unanimous understanding that consent is rendered ineffective as "against public policy" in assault cases characterized by aggressive and combative acts that breach public peace and physically endanger others.

¶19 The State of Washington is home to an unusual volume of these "public policy" exception cases. Washington courts have consistently held that the "public policy" exception applies only to brutish, irrational violence that endangers others. In *State v. Dejarlais*, the Supreme Court of Washington held that consent is not a defense to

10

violations of a domestic-violence protection order. 136 Wn. 2d 939, 942, 969 P.2d 90, 91 (Wash. 1998). In *State v. Hiott*, the court determined that consent is not a defense to a game in which two people agreed to shoot BB guns at each other because it was a breach of the public peace. 97 Wn. App. 825, 828, 987 P.2d 135, 137 (Wash. App. Div. 2 1999). In *State v. Weber*, the court held consent is not a defense to the charge of second degree assault between two incarcerated persons. 137 Wn. App. 852, 860, 155 P.3d 947, 951 (Wash. App. Div. 3 2007). The court noted there "is nothing redeeming or valuable in permitting fighting and every reason to dissuade it." *Weber*, 155 P.3d at 951.

¶20    In *State v. Fransua*, the Court of Appeals of New Mexico held that one person's taunting invitation to "go ahead" and shoot him did not establish a valid consent defense for another person who took him up on the offer. 85 N.M. 173, 174, 510 P.2d 106, 107 (N.M. App. 1973). In the Superior Court of New Jersey, a defendant claimed he was not guilty of assault and battery because he and his wife agreed that if she consumed alcohol he would physically assault her as punishment. *State v. Brown*, 143 N.J. Super. 571, 580, 364 A.2d 27, 32 (N.J. Super. L. Div. 1976). He argued consent as a defense after the state charged him with assault and battery. *Brown*, 364 A.2d at 28. The court held that failing to punish Brown "would seriously threaten the dignity, peace, health and security of our society." *Brown*, 364 A.2d at 32.

¶21    The above acts—including the *Mackrill* brawl—illustrate that sheer physical aggression that breaches public peace and endangers others is against public policy. In contrast, the act of a physician handing medicine to a terminally ill patient, and the

11

patient's subsequent peaceful and private act of taking the medicine, are not comparable to the violent, peace-breaching conduct that this Court and others have found to violate public policy.

¶22 The above cases address assaults in which the defendant alone performs a direct and violent act that causes harm. The bar brawler, prison fighter, BB gun-shooter, and domestic violence aggressor all committed violent acts that directly caused harm and breached the public peace. It is clear from these cases that courts deem consent ineffective when defendants directly commit blatantly aggressive, peace-breaching acts against another party.

¶23 In contrast, a physician who aids a terminally ill patient in dying is not directly involved in the final decision *or* the final act. He or she only provides a means by which a terminally ill patient *himself* can give effect to his life-ending decision, or not, as the case may be. Each stage of the physician-patient interaction is private, civil, and compassionate. The physician and terminally ill patient work together to create a means by which the patient can be in control of his own mortality. The patient's subsequent private decision whether to take the medicine does not breach public peace or endanger others.

¶24 Although the "against public policy" exception of § 45-2-211(2)(d), MCA, is not limited to violent breaches of the peace as discussed in the above cases, we see nothing in the case law facts or analysis suggesting that a patient's private interaction with his

physician, and subsequent decision regarding whether to take medication provided by a physician, violate public policy. We thus turn to a review of Montana statutory law.

¶25 We similarly find no indication in Montana statutes that physician aid in dying is against public policy. The Montana Rights of the Terminally Ill Act (Terminally Ill Act) and the homicide statute's narrow applicability to "another" human being, do not indicate that physician aid in dying is against public policy.

¶26 Under § 45-5-102, MCA, a "person commits the offense of deliberate homicide if: (a) the person purposely or knowingly causes the death of another human being . . . ." In physician aid in dying, the physician makes medication available for a terminally ill patient who requests it, and the patient would then choose whether to cause his own death by self-administering the medicine. The terminally ill patient's act of ingesting the medicine is not criminal. There is no language in the homicide statute indicating that killing "oneself," as opposed to "another," is a punishable offense, and there is no separate statute in Montana criminalizing suicide. There is thus no indication in the homicide statutes that physician aid in dying—in which a terminally ill patient elects and consents to taking possession of a quantity of medicine from a physician that, if he chooses to take it, will cause his own death—is against public policy.

¶27 There is similarly no indication in the Terminally Ill Act that physician aid in dying is against public policy. The Terminally Ill Act, by its very subject matter, is an apt statutory starting point for understanding the legislature's intent to give terminally ill patients—like Mr. Baxter—end-of-life autonomy, respect and assurance that their

13

life-ending wishes will be followed. The Terminally Ill Act expressly immunizes physicians from criminal and civil liability for following a patient's directions to withhold or withdraw life-sustaining treatment. Section 50-9-204, MCA. Indeed, the legislature has criminalized the *failure* to act according to the patient's wishes. Section 50-9-206, MCA. Other parts of the Terminally Ill Act also resonate with this respect for the patient's end-of-life preferences. Section 50-9-205, MCA, explicitly prohibits, "for any purpose," calling the patient's death a "suicide or homicide," and § 50-9-501, MCA, charges the Montana Attorney General with creating a "declaration registry" and waging a statewide campaign to educate Montanans about end-of-life decisionmaking. The statute even establishes a specialized state fund account specifically for the registry and education program. Section 50-9-502(b), MCA.

¶28    The Rights of the Terminally Ill Act very clearly provides that terminally ill patients are entitled to autonomous, end-of-life decisions, even if enforcement of those decisions involves direct acts by a physician. Furthermore, there is no indication in the Rights of the Terminally Ill Act that an additional means of giving effect to a patient's decision—in which the patient, without any direct assistance, chooses the time of his own death—is against public policy.

¶29    The Montana Legislature codified several means by which a patient's life-ending request can be fulfilled. The Terminally Ill Act authorizes an individual "of sound mind and 18 years of age or older to execute at any time a declaration governing the withholding or withdrawal of life-sustaining treatment." Section 50-9-103, MCA. The

Terminally Ill Act defines "life-sustaining treatment" as any medical procedure or intervention that "serves only to prolong the dying process." Section 50-9-102(9), MCA. The declaration is operative when it is communicated to the physician or registered nurse and the declarant is determined to be in a terminal condition and no longer able to vocalize his end-of-life wishes. Section 50-9-105, MCA.

¶30 The Terminally Ill Act, in short, confers on terminally ill patients a right to have their end-of-life wishes followed, even if it requires *direct* participation by a physician through withdrawing or withholding treatment. Section 50-9-103, MCA. Nothing in the statute indicates it is against public policy to honor those same wishes when the patient is conscious and able to vocalize and carry out the decision himself with self-administered medicine and no immediate or direct physician assistance.

¶31 The Terminally Ill Act contains declaration forms a patient may use to legally ensure his end-of-life instructions will be followed. The forms shed critical light on the end-of-life roles of terminally ill Montanans and their physicians, as envisioned and codified by the legislature. The first declaration states:

> If I should have an incurable or irreversible condition that, without the administration of life-sustaining treatment, will, in the opinion of my attending physician or attending advanced practice registered nurse, cause my death within a relatively short time and I am no longer able to make decisions regarding my medical treatment, I direct my attending physician or attending advanced practice registered nurse, pursuant to the Montana Rights of the Terminally Ill Act, to withhold or withdraw treatment that only prolongs the process of dying and is not necessary to my comfort or to alleviate pain.

Section 50-9-103(2), MCA. The declaration language of § 50-9-103, MCA, not only highlights the legislature's intent to provide terminally ill patients with various means to express (and have followed) their autonomous end-of-life preferences, but also authorizes physician involvement in both the terminal diagnosis and the act of withdrawing or withholding treatment.

¶32 The legislature, in creating this legally-enforceable declaration, also immunized physicians and medical professionals who act in accordance with the patient's wishes. The statute shields physicians from liability for following a patient's instructions to stop life-sustaining treatment, or refrain from treating him altogether. Section 50-9-204, MCA. The Dissent states that the Terminally Ill Act only allows the "taking away of, or refraining from giving" life-sustaining medical treatment. The Dissent's definition of "withdraw" confirms that this "taking away" is, itself, a direct act by the physician. "Withdrawal" is "*the act of* taking back or away" something that was granted. *Webster's Third New International Dictionary of the English Language* 2627 (Philip Babcock Gove ed., G. & C. Merriam Co. 1971) (emphasis added). The "giving" is an act, as is the "taking away." The Terminally Ill Act authorizes physicians to commit a direct *act* of withdrawing medical care, which hastens death. In contrast, the physician's involvement in aid in dying consists solely of making the instrument of the "act" available to the terminally ill patient. The patient himself then chooses whether to commit the act that will bring about his own death. The legislature codified public policy by expressly immunizing physicians who commit a direct act that gives effect to the life-ending wishes

16

of a terminally ill patient. Section 50-9-204, MCA. There is no suggestion in the Act that a lesser physician involvement (making available a lethal does of medicine)—which is then vetted by a terminally ill patient's intervening choice and subsequent self-administered ingestion—is against public policy.

¶33 The Terminally Ill Act explicitly shields physicians from criminal, civil or professional liability for the act of withdrawing or withholding life-sustaining treatment from a terminally ill patient who requests it. Section 50-9-204, MCA.[1] The legislature devoted an entire section to codifying this immunity, ensuring that physicians and nurses will not be held liable for acting consistent with a terminally ill patient's decision to die. Section 50-9-204, MCA, provides an extensive list of medical professionals and others exempt from prosecution:

> (a) a physician or advanced practice registered nurse who *causes* the withholding or withdrawal of life-sustaining treatment from a qualified patient; (b) a person who participates in the withholding or withdrawal of life-sustaining treatment under the direction or with the authorization of the physician or advanced practice registered nurse; (c) emergency medical services personnel who *cause or participate* in the withholding or withdrawal of life-sustaining treatment under the direction of or with the authorization of a physician or advanced practice registered nurse or who on receipt of reliable documentation follow a living will protocol . . . .

Section 50-9-204, MCA (emphasis added). The section also immunizes health care facilities, health care providers, and the patient's designee. Section 50-9-204(e), MCA.

---

[1] The Dissent has erred in its statement that the operative words in the Terminally Ill Act are those "permitting a patient" to withdraw or withhold life-sustaining treatment. Dissent, ¶ 107. The Rights of the Terminally Ill Act was created to address the situation in which patients *cannot* act on their own behalf and therefore must authorize others to act for them. The only individuals who *act* in this statute are non-patients—particularly, medical professionals—who follow the directions of a terminally ill patient and affirmatively withdraw or withhold treatment.

The Terminally Ill Act's second enactment expands this immunity to include emergency medical service personnel. Section 50-9-204(c), MCA. The statute explicitly states that the above individuals are "not subject to civil or criminal liability or guilty of unprofessional conduct." Section 50-9-204(1), MCA. This encompassing immunity for medical professionals reinforces the terminally ill patient's right to enforce his decision without fear that those who give effect to his wishes will be prosecuted.

¶34 Further, the legislature criminalized the failure to follow a patient's end-of-life instructions. A physician "who willfully fails to record the determination of terminal condition or the terms of a declaration" is punishable by a maximum $500 fine, a maximum one year in jail, or both. Section 50-9-206(2), MCA. A person who "purposely conceals, cancels, defaces, or obliterates the declaration of another without the declarant's consent" is punishable by the same. Section 50-9-206(3), MCA. The statute's message is clear: failure to give effect to a terminally ill patient's life-ending declaration is a crime.

¶35 Other parts of the Terminally Ill Act similarly reflect legislative respect for the patient's end-of-life autonomy and the physician's legal obligation to comply with the patient's declaration. Section 50-9-205, MCA, prohibits, *for any purpose*, treating the death as either "suicide or homicide." The legislature, by prohibiting anyone from deeming the act a homicide or suicide, ensured that insurance companies cannot punish a terminally ill patient and his family for the patient's choice to die.

18

¶36 The provision also lists behaviors not supported by the statute. Notably, physician aid in dying is not listed. Section 50-9-205(7), MCA, reads: "This chapter does not condone, authorize, or approve mercy killing or euthanasia." Physician aid in dying is, by definition, neither of these. Euthanasia is the "intentional putting to death of a person with an incurable or painful disease intended as an act of mercy." *Stedman's Medical Dictionary* 678 (28th ed., Lippincott Williams & Wilkins 2006). The phrase "mercy killing" is the active term for euthanasia defined as "a mode of ending life in which the intent is to cause the patient's death in a single act." *Stedman's Medical Dictionary* at 678. Neither of these definitions is consent-based, and neither involves a patient's autonomous decision to self-administer drugs that will cause his own death.

¶37 The final part of the Terminally Ill Act orders the Montana Attorney General to "establish and maintain a health care declaration registry" in which declarations are stored and updated. Section 50-9-501, MCA. The provision also creates a health care declaration account in the state special revenue fund, which the Attorney General must use to "create and maintain the health care declaration registry" and to create an education and outreach program. Section 50-9-502(b), MCA. The program must pertain to "advance health care planning and end-of-life health care decisionmaking." Section 50-9-505(1), MCA. The program must also "explain the need for readily available legal documents that express an individual's health care wishes." Section 50-9-505(c), MCA. The registry requirement, outreach and education provisions, and state funding for both, indicate legislative intent to honor and promulgate the rights of terminally ill patients to

autonomously choose the direction of their end-of-life medical care. There is no indication in the statutes that another choice—physician aid in dying—is against this legislative ethos of honoring the end-of-life decisions of the terminally ill.

¶38    There is no indication in the Rights of the Terminally Ill Act that physician aid in dying is against public policy. Indeed, the Act reflects legislative respect for the wishes of a patient facing incurable illness. The Act also indicates legislative regard and protection for a physician who honors his legal obligation to the patient. The Act immunizes a physician for following the patient's declaration even if it requires the physician to directly unplug the patient's ventilator or withhold medicine or medical treatment that is keeping the patient alive. Physician aid in dying, on the other hand, does not require such *direct* involvement by a physician. Rather, in physician aid in dying, the final death-causing act lies in the patient's hands. In light of the long-standing, evolving and unequivocal recognition of the terminally ill patient's right to self-determination at the end of life in Title 50, chapter 9, MCA, it would be incongruous to conclude that a physician's indirect aid in dying is contrary to public policy.

¶39    There are three central problems with the Dissent's response. First, the Dissent applies § 45-5-105, MCA—a statute that factually does not apply to Mr. Baxter's appeal. This statute only applies if the suicide does not occur. Second, the Dissent massages the statute's legislative history into makeshift legislation, which it then proffers as public policy. Such analysis directly violates this Court's precedent regarding statutory interpretation.

20

¶40     The Dissent first cites § 45-5-105, MCA, stating that a person may be prosecuted for aiding or soliciting suicide only if the individual *does not die*. Dissent, ¶ 101. The statute's plain meaning is clear. It is also inapplicable. The narrow scenario we have been asked to consider on appeal involves the situation in which a terminally ill patient affirmatively seeks a lethal dose of medicine and subsequently self-administers it, causing his own death. Section 45-5-105, MCA, unambiguously applies *only* when the suicide *does not* occur.

¶41     Under this Court's precedent, the inquiry stops there. We have repeatedly held that we will not interpret a statute beyond its plain language if the language is clear and unambiguous. *Mont. Sports Shooting Ass'n v.* State, 2008 MT 190, ¶ 11, 344 Mont. 1, 4, 185 P.3d 1003, 1006; *State v. Letasky*, 2007 MT 51, ¶ 11, 336 Mont. 178, 181, 152 P.3d 1288, 1290 ("We interpret a statute first by looking to the statute's plain language, and if the language is clear and unambiguous, no further interpretation is required."). Here, the legislature could not have provided clearer, more unambiguous language. If the person does not die, the statute is triggered. If they do die, the statute is not triggered. The statute provides only *one* clear set of circumstances where a person may be prosecuted. There is simply nothing ambiguous about it.

¶42     While conceding on the one hand that § 45-5-105, MCA, applies only when the suicide *does not* occur, the Dissent nonetheless unilaterally revises the statute, stating that "under Montana law, physicians who assist in a suicide are subject to criminal prosecution irrespective of whether the patient *survives* or *dies*." Dissent, ¶ 102. This is

21

incorrect under the law. Not only does the language of the statute clearly and *only* address the scenario in which the "suicide *does not* occur" but the Commission comments themselves do not even provide enlightenment on the legislature's intent regarding the language of the aid or soliciting suicide statute itself. Instead, the Commission comments speak of a different statute (and crime) altogether: Homicide. In fact, the comments analyze language, such as "agent of death," that does not even appear in the aid or soliciting statute or anywhere else in the Montana code. The Dissent not only disregards this Court's precedent regarding statutory interpretation, but it also grants the uncodified comments of eleven unelected individuals the weight of law.

¶43 The Dissent argues that consent to physician aid in dying is against public policy simply because the conduct is defined as an offense under the criminal statutes. That reasoning is circular. The Dissent cannot obviate a separate consent statute by simply saying that all statutory crimes are by definition against public policy, therefore consent to that conduct is *also* against public policy. If that were the case, the legislature would not have felt compelled to enact a separate consent statute. By enacting this separate consent statute, the legislature obviously envisioned situations in which it is not against public policy for a victim to consent to conduct that would otherwise constitute an offense under the criminal statutes.

¶44 Even if this Court were to extend consideration to § 45-5-105, MCA, as a generalized reflection of the legislature's views on third party involvement in suicides, there remains no indication that the statute was ever intended to apply to the very narrow

22

set of circumstances in which a terminally ill patient *himself* seeks out a physician and asks the physician to provide him the means to end his own life. As the Dissent states, the original enactment addressed situations of a third party "encouraging" a suicide. Dissent, ¶ 99. The present version reflects the same focus in the "soliciting" language. The statute's plain language addresses the situation in which a third party unilaterally solicits or aids another person. In physician aid in dying, the solicitation comes from the patient himself, *not* a third party physician.

¶45 There is no indication that the 1973 Montana legislators contemplated the statute would apply to this specific situation in which a terminally ill patient seeks a means by which he can end his own incurable suffering. In fact, it was not until twelve years later in 1985, that the legislature enacted the Rights of the Terminally Ill Act, which squarely addresses the modern complexities of physician- and technology-dependent end-of-life care provided to terminally ill Montanans. Since then, the legislature—as illustrated in the Terminally Ill Act analysis above—has carefully cultivated a statutory scheme that gives terminally ill Montanans the right to autonomously choose what happens to them at the end of painful terminal illness.

¶46 Finally, we determine whether the District Court erred in awarding Mr. Baxter attorney fees. Following entry of the District Court's judgment on the constitutional claims, Mr. Baxter moved to amend under M. R. Civ. P. 59(g) to include an award of attorney fees as supplemental relief under § 27-8-313, MCA, and the private attorney general doctrine. The District Court awarded attorney fees to Mr. Baxter under the

private attorney general doctrine. We review a grant or denial of attorney fees for abuse of discretion. *Trs. of Ind. Univ. v. Buxbaum*, 2003 MT 97, ¶ 15, 315 Mont. 210, 216, 69 P.3d 663, 667.

¶47 The private attorney general doctrine applies when the government fails to properly enforce interests which are significant to its citizens. *Montanans for the Responsible Use of the Sch. Trust v. State ex rel. Bd. of Land Commissioners,* 1999 MT 263, ¶ 64, 296 Mont. 402, 421, 989 P.2d 800, 811. The private attorney general doctrine, however, applies only when constitutional interests are vindicated. *Am. Cancer Soc'y v. State*, 2004 MT 376, ¶ 21, 325 Mont. 70, 78, 103 P.3d 1085, 1091. Our holding today is statute-based. Therefore, without the vindication of constitutional interests, an award of fees under the private attorney general doctrine is not warranted.

¶48 Although attorney fees may be appropriate "further relief" under § 27-8-313, MCA, "such fees are only appropriate if equitable considerations support the award." *United Nat'l Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 2009 MT 269, ¶ 38, 352 Mont. 105, 118, 214 P.3d 1260, 1271. As in *United National*, the equitable considerations here do not support an award of attorney fees. Mr. Baxter is accompanied by other plaintiffs, including four physicians and Compassion & Choices, a national nonprofit organization. The relief herein granted to the Plaintiffs is not incomplete or inequitable without the Montana taxpayers having to pay the attorney fees.

¶49 In conclusion, we find nothing in Montana Supreme Court precedent or Montana statutes indicating that physician aid in dying is against public policy. The "against

public policy" exception to consent has been interpreted by this Court as applicable to violent breaches of the public peace. Physician aid in dying does not satisfy that definition. We also find nothing in the plain language of Montana statutes indicating that physician aid in dying is against public policy. In physician aid in dying, the patient—not the physician—commits the final death-causing act by self-administering a lethal dose of medicine.

¶50 Furthermore, the Montana Rights of the Terminally Ill Act indicates legislative respect for a patient's autonomous right to decide if and how he will receive medical treatment at the end of his life. The Terminally Ill Act explicitly shields physicians from liability for acting in accordance with a patient's end-of-life wishes, even if the physician must actively pull the plug on a patient's ventilator or withhold treatment that will keep him alive. There is no statutory indication that lesser end-of-life physician involvement, in which the patient himself commits the final act, is against public policy. We therefore hold that under § 45-2-211, MCA, a terminally ill patient's consent to physician aid in dying constitutes a statutory defense to a charge of homicide against the aiding physician when no other consent exceptions apply.

¶51 The District Court's ruling on the constitutional issues is vacated, although the court's grant of summary judgment to Plaintiffs/Appellees is affirmed on the alternate statutory grounds set forth above. The award of attorney fees is reversed.

/S/ W. WILLIAM LEAPHART

25

We concur:

/S/ PATRICIA O. COTTER
/S/ JOHN WARNER
/S/ BRIAN MORRIS

Justice John Warner concurs.

¶52    I concur.

¶53    The Court's opinion today answers the statutory question: is it, as a matter of law, against the public policy of Montana for a physician to assist a mentally competent, terminally ill person to end their life?  The answer provided is: "No, it is not, as a matter of law."

¶54    This Court correctly avoided the constitutional issue Baxter desires to present.  No question brought before this Court is of greater delicacy than one that involves the power of the legislature to act.  If it becomes indispensably necessary to the case to answer such a question, this Court must meet and decide it; but it is not the habit of the courts to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.  *See e.g. Ex parte Randolph*, 20 F. Cas. 242, 254 (C.C.Va. 1833) (Marshall, Circuit Justice); *Burton v. United States*, 196 U.S. 283, 295, 25 S. Ct. 243, 245 (1905); *State v. Kolb*, 2009 MT 9, ¶ 13, 349 Mont. 10, 200 P.3d 504; *Common Cause of Montana v. Statutory Committee to Nominate Candidates for Commr. of Political Practices*, 263

26

Mont. 324, 329, 868 P.2d 604, 607 (1994); *Wolfe v. State, Dept. of Labor and Industry, Board of Personnel Appeals*, 255 Mont. 336, 339, 843 P.2d 338, 340 (1992).

¶55    This Court has done its job and held that pursuant to § 45-2-211, MCA, a physician who assists a suicide, and who happens to be charged with a crime for doing so, may assert the defense of consent.  I join the opinion, and not the thoughtful and thought provoking dissent, because the Legislature has not plainly stated that assisting a suicide is against public policy.  This Court must not add such a provision by judicial fiat. Section 1-2-101, MCA.

¶56    The logic of the Court's opinion is not necessarily limited to physicians.  In my view, the citizens of Montana have the right to have their legislature step up to the plate and squarely face the question presented by this case, do their job, and decide just what is the policy of Montana on this issue.

¶57    As for the constitutional analysis requested by Baxter, I have found many times in my judicial career that Viscount Falkland is correct: when it is not necessary to make a decision, it is necessary to not make a decision.  A question of constitutional law should not be anticipated in advance of the necessity of deciding it.  *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346-47, 56 S. Ct. 466, 483 (1936) (Brandeis, J., concurring) (quoting *Liverpool, N.Y. & Phila. Steamship Co. v. Emigration Commissioners*, 113 U.S. 33, 39, 5 S. Ct. 352, 355 (1885)).

/S/ JOHN WARNER

27

Justice James C. Nelson, specially concurring.

¶58 *I have lived a good and a long life, and have no wish to leave this world prematurely. As death approaches from my disease, however, if my suffering becomes unbearable I want the legal option of being able to die in a peaceful and dignified manner by consuming medication prescribed by my doctor for that purpose. Because it will be my suffering, my life, and my death that will be involved, I seek the right and responsibility to make that critical choice for myself if circumstances lead me to do so. I feel strongly that this intensely personal and private decision should be left to me and my conscience – based on my most deeply held values and beliefs, and after consulting with my family and doctor – and that the government should not have the right to prohibit this choice by criminalizing the aid in dying procedure.*[1]

¶59 With the exception of the Court's decision to vacate the District Court's ruling on the constitutional issues, Opinion, ¶ 51, I otherwise join the Court's Opinion. For the reasons which follow, I agree with the Court's analysis under the consent statute (§ 45-2-211, MCA), and I further conclude that physician aid in dying is protected by the Montana Constitution as a matter of privacy (Article II, Section 10) and as a matter of individual dignity (Article II, Section 4).

## I. STATUTORY ANALYSIS

¶60 The Court and the Dissent offer two conflicting analyses of "public policy" under the consent statute. *See* Opinion, ¶¶ 14-45; Dissent, ¶¶ 99-110. In my view, the Court has the better argument. As the Court points out, the consent statute plainly contemplates that it is not against public policy in certain situations for a victim to consent to conduct

---

[1] Aff. Robert Baxter ¶ 9 (June 28, 2008). Baxter (one of the plaintiffs-appellees in this case) died of leukemia on December 5, 2008—the same day the District Court issued its ruling in his favor, holding that under the Montana Constitution a mentally competent, incurably ill patient has the right to die with dignity by obtaining physician aid in dying.

that otherwise would constitute an offense under the criminal statutes. Opinion, ¶ 43. I agree with the Court that there is no indication in Montana caselaw or statutory law that physician aid in dying is against public policy. In this regard, the Dissent is incorrect in stating that *the Legislature* eliminated the consent defense for aiding suicide under § 45-5-105, MCA. Dissent, ¶ 105. The Dissent points to nothing in the plain language of the consent statute standing for this proposition. Rather, the Dissent relies on the uncodified 1973 Criminal Law Commission Comments to § 45-5-105, MCA. *See* Dissent, ¶¶ 101-103, 105. Of course, these Commission Comments do not carry the weight of law. Opinion, ¶ 42. Moreover, I do not find the presumed statements of public policy reflected in these 1973 Commission Comments to be of any persuasive value here. The Legislature has since codified a different public policy in the 1985 Montana Rights of the Terminally Ill Act—specifically, that a mentally competent, incurably ill individual should have autonomy with regard to end-of-life decisions and should be afforded respect and assurance that her life-ending wishes will be honored, even if enforcement of the patient's instructions involves a direct act by the physician (such as withdrawing life-sustaining medical treatment) which in turn causes the patient's death. *See generally* Opinion, ¶¶ 27-38; Title 50, chapter 9, MCA.

¶61 Our decision today, therefore, provides a mentally competent, incurably ill individual with at least one avenue to end her mental and physical suffering with a physician's assistance. Under the consent statute, it is not against public policy for the physician to provide the individual with the prescription for a life-ending substance to be

29

self-administered by the individual at her choice of time and place. As an obvious corollary to this, the individual retains the right to change her mind as her condition progresses for better or worse—i.e., the patient retains the absolute right to make the ultimate decision of whether to take the life-ending substance. As such, in physician aid in dying the physician simply makes medication available to the patient who requests it and the patient ultimately chooses whether to cause her own death by self-administering the medicine—an act which itself is not criminal. Opinion, ¶¶ 26, 32.

¶62 I accordingly agree with the Court's analysis and conclusion that the patient's consent to physician aid in dying constitutes a statutory defense to a charge of deliberate homicide against the aiding physician under § 45-5-102, MCA, where the patient takes the life-ending substance and ends her life. Opinion, ¶ 50. This same conclusion, of course, applies to a charge of aiding suicide under § 45-5-105, MCA, where the patient does not take the substance. In either event, the physician is not culpable.

¶63 For these reasons, I concur in the Court's Opinion—except, as noted, the decision to vacate the District Court's ruling on the constitutional issues.

## II. CONSTITUTIONAL ANALYSIS

¶64 Although the Court has chosen to decide this case on the narrow statutory ground suggested by the State of Montana (as an alternative approach) in its briefs on appeal, Opinion, ¶ 10, and although physician aid in dying is protected statutorily (as the Court holds under this alternative approach), physician aid in dying is also firmly protected by Montana's Constitution. In this regard, I compliment District Court Judge Dorothy

McCarter for her well-written, compassionate, and courageous—indeed, visionary—interpretation of our Constitution. The parties have extensively briefed the constitutional issues, *see* Opinion, ¶ 10, and the Dissent touches on them as well, *see* Dissent, ¶¶ 112-116. For these reasons, and because I so passionately believe that individual dignity is, in all likelihood, the most important—and yet, in our times, the most fragile—of all human rights protected by Montana's Constitution, I proceed to explain what I believe the right of dignity means within the context of this case—one of the most important cases the courts of this state have ever considered.

¶65 The District Court's decision is grounded in both the right of individual dignity guaranteed by Article II, Section 4 and the right of individual privacy guaranteed by Article II, Section 10. Likewise, the Plaintiff-Appellee patients (Patients) and their amici present arguments under both provisions. With regard to Article II, Section 10, they persuasively demonstrate that under *Gryczan v. State*, 283 Mont. 433, 942 P.2d 112 (1997), and *Armstrong v. State*, 1999 MT 261, 296 Mont. 361, 989 P.2d 364, physician aid in dying is protected by the right of individual privacy. Indeed, this Court held in *Armstrong* that "the personal autonomy component of this right broadly guarantees each individual the right to make medical judgments affecting her or his bodily integrity and health in partnership with a chosen health care provider free from the interference of the government . . . ." *Armstrong*, ¶ 75. As noted, however, I believe that this case—aid in dying so as to die with dignity—is most fundamentally and quintessentially a matter of

human dignity.  Accordingly, it is to that right that I direct my comments below.  But before doing so, it is necessary to define and explain my choice of terms and language.

### A.  Terminology and Language

¶66    First, let me be clear about one thing:  This case is not about the "right to die."  Indeed, the notion that there is such a "right" is patently absurd, if not downright silly.  No constitution, no statute, no legislature, and no court can grant an individual the "right to die."  Nor can they take such a right away.  "Death is the destiny of everything that lives.  Nothing ever escapes it."[2]  Within the context of this case, the only control that a person has over death is that if he expects its coming within a relatively short period of time due to an incurable disease, he can simply accept his fate and seek drug-induced comfort; or he can seek further treatment and fight to prolong death's advance; or, at some point in his illness, and with his physician's assistance, he can embrace his destiny at a time and place of his choosing.  The only "right" guaranteed to him in any of these decisions is the right to preserve his personal autonomy and his individual dignity, as he sees fit, in the face of an ultimate destiny that no power on earth can prevent.

¶67    Thus noted, the Patients and the class of individuals they represent are persons who suffer from an illness or disease, who cannot be cured of their illness or disease by any reasonably available medical treatment, who therefore expect death within a relatively short period of time, and who demand the right to preserve their personal autonomy and their individual dignity in facing this destiny.

---

[2] John Shelby Spong, *Eternal Life: A New Vision*, 73 (HarperCollins 2009).

¶68 In choosing this language, I purposely eschew bright-line tests or rigid timeframes. What is "relatively short" varies from person to person. I take this approach[3] for the following nonexclusive reasons. **First,** the amount of physical, emotional, spiritual, and mental suffering that one is willing or able to endure is uniquely and solely a matter of individual constitution, conscience, and personal autonomy. **Second,** "suffering" in this more expansive sense may implicate a person's uniquely personal perception of his "quality of life." This perception may be informed by, among other things, one's level of suffering, one's loss of personal autonomy, one's ability to make choices about his situation, one's ability to communicate, one's perceived loss of value to self or to others, one's ability to care for his personal needs and hygiene, one's loss of dignity, one's financial situation and concern over the economic burdens of prolonged illness, and one's level of tolerance for the invasion of personal privacy and individual dignity that palliative treatment necessarily involves. Suffering may diminish the quality of life; on the other hand, the lack of suffering does not guarantee a life of quality. There is a difference between living and suffering; and the sufferer is uniquely positioned and, therefore, uniquely entitled to define the tipping point that makes suffering unbearable. **Third,** while most incurable illnesses and diseases follow a fairly predictable symptomatology and course, every illness and disease is a unique and very personal experience for the afflicted person. Thus, the afflicted individual's illness or disease informs his end-of-life choices and decisions in ways unique and personal to that

---

[3] *See generally* Raphael Cohen-Almagor, *The Right to Die with Dignity*, 27-33, 52-79, 96-112 (Rutgers University Press 2001).

33

individual's life, values, and circumstances. **Fourth,** advancements in medical treatment may become available during the period between the time when he is diagnosed as being incurably ill and the predicted (estimated) time of death. With those advancements, a person initially given three months to live may well expect to live two more months or two more years with a new medicine or treatment. **Fifth,** individual access to medical care may vary. A person living in proximity to a medical research facility may have access to medicines and treatments as part of a clinical trial, while another person living in a sparsely populated rural area may not have that opportunity. One individual may have access to hospice care; another may not. Sadly, an insured individual may have access to medicine and treatment that an uninsured individual does not. **Sixth,** each individual's family situation is different. One individual may not have close family relationships; another may have a strongly involved and supportive family. One person's family may live within a short distance, while another person's family may be spread across the country or around the globe. The ability to say final goodbyes and the ability to die, at a predetermined time and place, perhaps in the company of one's partner or friends and loved ones, is important to many individuals and to their families. **Seventh,** and lastly, to many who are incurably ill and dying, the prospect of putting their partner or family through their prolonged and agonizing death is a source of deep emotional and spiritual distress.

¶69     Additionally, in my choice of language, I have intentionally chosen not to use emotionally charged and value-laden terms such as "terminal" and "suicide." "Terminal"

conjures up the notion that the individual is on some sort of inevitable slide or countdown to death. This term trivializes the fact that many individuals, with what appear to be medically incurable diseases, nevertheless retain steadfast hope and faith that their condition will be reversed, along with a personal resolve to fight for life until the very end. Labeling an individual as "terminal" may not only discourage the individual from seeking treatment but may also discourage further treatment efforts by healthcare providers. A "terminal" diagnosis fails to acknowledge that medicine usually cannot predict the time of death with the sort of exactitude that the use of the term connotes.

¶70 Similarly, the term "suicide" suggests an act of self-destruction that historically has been condemned as sinful, immoral, or damning by many religions. Moreover, in modern parlance, "suicide" may be linked with terrorist conduct. Importantly, and as reflected in the briefing in this case, society judges and typically, but selectively, deprecates individuals who commit "suicide." On one hand, the individual who throws his body over a hand grenade to save his fellow soldiers is judged a hero, not a person who committed "suicide." Yet, on the other hand, the individual who shoots herself because she faces a protracted illness and agonizing death commits "suicide" and, as such, is judged a coward in the face of her illness and selfish in her lack of consideration for the pain and loss her act causes to loved ones and friends. Assisting this person to end her life is likewise denounced as typifying " 'a very low regard for human life.' " Dissent, ¶ 118 (quoting the Commission Comments to § 45-5-105, MCA). To the contrary, however, the Patients and their amici argue that a physician who provides aid in

35

dying demonstrates compassionate regard for the patient's suffering, recognition of the patient's autonomy and dignity, and acknowledgement of death's inevitability.

¶71    "Suicide" is a pejorative term in our society. Unfortunately, it is also a term used liberally by the State and its amici (as well as the Dissent) in this case. The term denigrates the complex individual circumstances that drive persons generally—and, in particular, those who are incurably ill and face prolonged illness and agonizing death—to take their own lives. The term is used to generate antipathy, and it does. The Patients and the class of people they represent do not seek to commit "suicide." Rather, they acknowledge that death within a relatively short time is inescapable because of their illness or disease. And with that fact in mind, they seek the ability to self-administer, at a time and place of their choosing, a physician-prescribed medication that will assist them in preserving their own human dignity during the inevitable process of dying. Having come to grips with the inexorability of their death, they simply ask the government not to force them to suffer and die in an agonizing, degrading, humiliating, and undignified manner. They seek nothing more nor less; that is all this case is about.

¶72    Finally, I neither use the terms nor address "euthanasia" or "mercy killing." Aside from the negative implications of these terms and the criminality of such conduct, the Patients clearly do not argue that incompetent, nonconsenting individuals or "vulnerable" people may be, under any circumstances, "euthanized" or "murdered." To read their arguments as suggesting either is, in my view, grossly unfair and intellectually dishonest. The only reason that "homicide" is implicated at all in this case is because (a) the State

contends that a licensed physician who provides a mentally competent, incurably ill patient with the prescription for a life-ending substance, to be self-administered by the patient if she so chooses, is guilty of deliberate homicide and (b) our decision holds that it is not against public policy under the consent statute to permit the physician to do so.

¶73 With that prefatory explanation, I now turn to Article II, Section 4 and the right of individual dignity.

### B. Construction of Article II, Section 4

¶74 Article II, Section 4 of Montana's 1972 Constitution provides:

> **Individual dignity.** The dignity of the human being is inviolable. No person shall be denied the equal protection of the laws. Neither the state nor any person, firm, corporation, or institution shall discriminate against any person in the exercise of his civil or political rights on account of race, color, sex, culture, social origin or condition, or political or religious ideas.

While there are differing interpretations of this language, which I note below, it is my view that the first clause of Article II, Section 4 (the Dignity Clause) is a stand-alone, fundamental constitutional right. *See Walker v. State*, 2003 MT 134, ¶¶ 74, 82, 316 Mont. 103, 68 P.3d 872 (explaining that the rights found in Article II are "fundamental" and that the plain meaning of the Dignity Clause "commands that the intrinsic worth and the basic humanity of persons may not be violated").

¶75 First, I categorically reject the notion that the Dignity Clause is merely some "aspirational introduction" to the equal protection and nondiscrimination rights which follow it—a proposition for which there is no authority. Our Constitution is "a limitation upon the powers of government," *Cruse v. Fischl*, 55 Mont. 258, 263, 175 P. 878, 880

37

(1918), and in construing a constitutional provision, we are required "to give meaning to every word, phrase, clause and sentence therein, if it is possible so to do," *State ex rel. Diederichs v. State Highway Commn.*, 89 Mont. 205, 211, 296 P. 1033, 1035 (1931). Accordingly, the command that "[t]he dignity of the human being is inviolable" must be acknowledged as the freestanding limitation it is on the power of the government—much in the same way we recognize that trial by jury, which is similarly "inviolate" (Mont. Const. art. II, § 26), is not merely "aspirational" but is in fact a concrete right guaranteed by the Constitution.

¶76    Second, I likewise reject the notion that the right of dignity is fully implemented by the Equal Protection and Nondiscrimination Clauses or that these clauses are the sole "operative vehicles" for achieving dignity. In other words, I cannot agree that the inviolable dignity of a human being is infringed only when the person is denied equal protection of the laws or suffers discrimination for exercising his or her civil or political rights. Indeed, such an interpretation of Article II, Section 4 attributes an implausibly narrow meaning to the term "dignity." As the Dissent notes, the Dignity Clause can be traced to West Germany's 1949 Constitution, which was developed in response to the Nazi regime's treatment of the Jewish people (as well as homosexuals, Gypsies, persons with disabilities, and political opponents). Dissent, ¶ 116 n. 4. These "inferior" people (so-called "useless eaters"[4]) were not merely denied equal protection of the laws. The

---

[4] George J. Annas, *The Man on the Moon, Immortality, and other Millennial Myths: The Prospects and Perils of Human Genetic Engineering*, 49 Emory L.J. 753, 758 (2000).

38

government placed them in concentration camps and used them for slave labor. Medical experiments were performed on them. They were persecuted and killed. They were viewed and treated as subhuman, without any dignity. The West German Constitution and its command that "[t]he dignity of man shall be inviolable" must be understood in this context. Doing so, it simply cannot be maintained that Article II, Section 4 prohibits only discrimination and the denial of equal protection. The Dignity Clause broadly prohibits any law or act that infringes upon our inviolable dignity as human beings. This is not some "vague, lurking" right as the Dissent suggests. Dissent, ¶ 116. Rather, it is an imperative; an affirmative and unambiguous constitutional mandate.

¶77   This interpretation is supported by the structure of Article II, Section 4. In this connection, I agree with the construction proffered by Matthew O. Clifford and Thomas P. Huff in their article *Some Thoughts on the Meaning and Scope of the Montana Constitution's "Dignity" Clause with Possible Applications*, 61 Mont. L. Rev. 301, 305-07 (2000). They point out that the language of Article II, Section 4 (which is titled "Individual Dignity") moves in a logical progression from the general to the specific. The first sentence (the Dignity Clause) declares that human dignity is inviolable. The second sentence (the Equal Protection Clause) goes on to declare one way in which human dignity can be violated: by denying someone the equal protection of the laws based on some sort of arbitrary classification. They observe that our legal tradition has long recognized such classifications as affronts to the dignity of persons (citing as an example of this *Brown v. Board of Education*, 347 U.S. 483, 74 S. Ct. 686 (1954)).

Finally, the third sentence (the Nondiscrimination Clause) fleshes out the meaning of the equal protection right by enumerating certain types of classifications which the framers of Article II, Section 4 believed to be arbitrary: race, color, sex, culture, social origin or condition, and political or religious ideas.

¶78     Clifford and Huff note that the classifications identified in the Nondiscrimination Clause cannot be read as an exhaustive list of all possible arbitrary classifications. Otherwise, if the list were exhaustive, the Equal Protection Clause would be surplusage. The more reasonable interpretation, they conclude, is that by including the separate and more general Equal Protection Clause, the framers intended to leave open the possibility that there are other prohibited classifications beyond those which were recognized at that point in history (i.e., in 1972). And by the same logic, the inclusion of a more general prohibition against the violation of human dignity leaves open the possibility that human dignity can be violated in ways that do not involve some sort of arbitrary classification. Indeed, they argue, and I agree, that in order to give distinct and independent meaning to the Dignity Clause, avoiding redundancy, "this clause should be applied separately when there is a violation of the dignity of persons that does not reflect the forms of unequal treatment or invidious discrimination prohibited by the two subsequent clauses. Presumably anyone could experience such a violation of dignity, not just persons who are members of protected classes."[5]  Clifford and Huff, 61 Mont. L. Rev. at 306-07.

---

[5] Such is the case here, and that fact distinguishes my analysis herein from my analysis in *Snetsinger v. Montana University System*, 2004 MT 390, 325 Mont. 148, 104 P.3d 445. *Snetsinger* involved discrimination and equal protection issues relating to

¶79 This interpretation is consistent with the debate on Article II, Section 4 at the 1971-1972 Constitutional Convention.[6] During the debate, Delegate Jerome T. Loendorf inquired whether the express prohibition against discrimination was necessary, given that the right of equal protection already prohibits discrimination. Delegate Wade J. Dahood (chair of the Bill of Rights Committee) acknowledged that the Nondiscrimination Clause was "subsumed in" the Equal Protection Clause, but he explained that "when we're dealing with this type of right, Delegate Loendorf, and we are dealing with something that is this basic, to an orderly and progressive society perhaps sometimes the sermon that can be given by constitution, as well as the right, becomes necessary." Montana Constitutional Convention, Verbatim Transcript, Mar. 7, 1972, pp. 1643-44. Thus, the delegates decided that it was preferable to include the additional language making certain facets of the equal protection right explicit. This same principle supports the notion that denying someone the equal protection of the laws is but *one* way in which human dignity can be violated, as discussed above.

---

sexual orientation. Thus, applying Clifford and Huff's analytical model, I analyzed these issues under each sentence of Article II, Section 4. *See Snetsinger*, ¶¶ 71-97 (Nelson, J., specially concurring). The present case, however, does not involve discrimination or equal protection claims. It is appropriate, therefore, to apply only the Dignity Clause, as a stand-alone constitutional protection.

[6] I acknowledge that the intent of the framers should be determined from the plain meaning of the words used and, if that is possible (as it is here), then we apply no other means of interpretation. Indeed, "[w]e are precluded . . . from resorting to extrinsic methods of interpretation." *Great Falls Tribune Co. v. Great Falls Public Schools*, 255 Mont. 125, 128-29, 841 P.2d 502, 504 (1992) (internal quotation marks omitted). The Dissent, however, relies on the Constitutional Convention record. Dissent, ¶¶ 112-116. Thus, I discuss this record for purposes of responding to the Dissent's arguments.

¶80    In arguing against this interpretation of Article II, Section 4, the Dissent points to Delegate Dahood's statement that "[t]here is no intent within this particular section to do anything other than to remove the apparent type of discrimination that all of us object to with respect to employment, to rental practices, to actual associationship in matters that are public or matters that tend to be somewhat quasi-public."   Montana Constitutional Convention, Verbatim Transcript, Mar. 7, 1972, p. 1643.  This statement, however, must be understood in context.  Dahood was not purporting to limit the scope of Article II, Section 4.  In fact, he was trying to keep the provision broad.  Delegate Otto T. Habedank had voiced a concern that the language "any person, firm, corporation, or institution" in the Nondiscrimination Clause would prohibit private organizations from limiting their membership and would force individuals to associate with people they otherwise would choose not to associate with.   *See* Montana Constitutional Convention, Verbatim Transcript, Mar. 7, 1972, p. 1643.  Habedank therefore had moved to delete the "any person, firm, corporation, or institution" language from the Nondiscrimination Clause, thereby rendering the clause applicable to only the state.  *See* Montana Constitutional Convention, Verbatim Transcript, Mar. 7, 1972, p. 1642.  Dahood, in turn, argued against this amendment (which ultimately was defeated 76 to 13) and in favor of applying the nondiscrimination prohibition to entities other than the state, such as employers, landlords, and public or quasi-public associations.  Dahood made no remarks about the Dignity Clause itself.

42

¶81 In contrast, Delegate Proposal No. 33 specifically recognized an independent right of individual dignity. It stated: "The rights of individual dignity, privacy, and free expression being essential to the well-being of a free society, the state shall not infringe upon these rights without the showing of a compelling state interest." *See* Montana Constitutional Convention, Delegate Proposals, Jan. 26, 1972, p. 127. This proposal was referred to the Bill of Rights Committee, which adopted the proposal *in its entirety. See* Montana Constitutional Convention, Bill of Rights Committee Proposal, Feb. 23, 1972, p. 647. The right of individual dignity, the right of privacy, and the right of free expression were then incorporated, respectively, into Sections 4, 10, and 7 of Article II.[7]

¶82 In sum, given the plain language of Article II, Section 4 and the structure of this provision, I conclude that the Dignity Clause—stating that the dignity of the human being is inviolable—is a stand-alone, fundamental constitutional right. This conclusion is supported by the record from the Constitutional Convention. I now turn to the substance of this right.

## C. The Right of Human Dignity

---

[7] In this regard, the Dissent points out that the Bill of Rights Committee did not adopt Delegate Robert L. Kelleher's Proposal No. 103, which stated: "A human fetus has the right to be born. The incurably ill have the right not to be kept alive by extraordinary means." *See* Dissent, ¶¶ 113-115. Of course, we are not dealing in this case with "the right not to be kept alive by extraordinary means"—a matter already addressed statutorily by the Montana Rights of the Terminally Ill Act (Title 50, chapter 9, MCA). Moreover, the reasons behind the committee's decision on Proposal No. 103 are not stated in the Constitutional Convention record, and this Court has already rejected a similar attempt to read more than is warranted into the disposition of this proposal (*see Armstrong v. State*, 1999 MT 261, ¶¶ 43-48, 296 Mont. 361, 989 P.2d 364). In short, the disposition of Kelleher's proposal is simply not instructive here.

¶83 Human dignity is, perhaps, the most fundamental right in the Declaration of Rights. This right is "inviolable," meaning that it is "[s]afe from violation; *incapable* of being violated." *Black's Law Dictionary* 904 (Bryan A. Garner ed., 9th ed., West 2009) (emphasis added). Significantly, the right of human dignity is the only right in Montana's Constitution that is "inviolable."[8] It is the only right in Article II carrying the *absolute prohibition* of "inviolability." No individual may be stripped of her human dignity under the plain language of the Dignity Clause. No private or governmental entity has the right or the power to do so. Human dignity simply cannot be violated—no exceptions. *Snetsinger v. Montana University System*, 2004 MT 390, ¶ 77, 325 Mont. 148, 104 P.3d 445 (Nelson, J., specially concurring).

¶84 But what exactly is "dignity"? It would be impractical here to attempt to provide an exhaustive definition. Rather, the meaning of this term must be fleshed out on a case-by-case basis (in the same way that the parameters of substantive due process have been determined on a case-by-case basis). I note, however, a couple of interpretations that are useful for purposes of the present discussion. Law professor Raphael Cohen-Almagor states that the concept of dignity "refers to a worth or value that flows from an inner source. It is not bestowed from the outside but rather is intrinsic to the person." Raphael Cohen-Almagor, *The Right to Die with Dignity*, 17 (Rutgers University Press 2001). He argues that "[t]o have dignity, means to look at oneself with self-respect, with some sort

---

[8] As noted, the right of trial by jury is "inviolate." Mont. Const. art. II, § 26. "Inviolate," however, means "[f]ree from violation; not broken, infringed, or impaired," *Black's Law Dictionary* 904, which is not the same as "incapable of being violated."

44

of satisfaction.  We feel human, not degraded." Cohen-Almagor, *The Right to Die with Dignity* at 17.  Similarly, Clifford and Huff explain that in our Western ethical tradition, especially after the Religious Reformation of the 16th and 17th centuries, dignity has typically been associated with the normative ideal of individual persons as intrinsically valuable, as having inherent worth as individuals, at least in part because of their capacity for independent, autonomous, rational, and responsible action.  Clifford and Huff, 61 Mont. L. Rev. at 307.  Under this conception, dignity is *directly* violated by degrading or demeaning a person.  Clifford and Huff, 61 Mont. L. Rev. at 307; *see also e.g. Walker v. State*, 2003 MT 134, ¶¶ 81-84, 316 Mont. 103, 68 P.3d 872 (recognizing this principle and holding that the correctional practices and living conditions to which Walker was subjected at the Montana State Prison violated his right of human dignity).  Or dignity is *indirectly* violated by denying a person the opportunity to direct or control his own life in such a way that his worth is questioned or dishonored.  For example, dignity could be indirectly undermined "by treatment which is paternalistic—treating adults like children incapable of making autonomous choices for themselves, or by trivializing what choices they do make about how to live their lives."  Clifford and Huff, 61 Mont. L. Rev. at 307-08; *cf. Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 289, 110 S. Ct. 2841, 2857 (1990) (O'Connor, J., concurring) (requiring a competent adult to endure the procedures of being fed artificially by means of a tube against her will "burdens the patient's liberty, dignity, and freedom to determine the course of her own treatment").  Significantly, this Court has held that "[r]espect for the dignity of each individual . . .

demands that people have for themselves the moral right and moral responsibility to confront the most fundamental questions about the meaning and value of their own lives and the intrinsic value of life in general, answering to their own consciences and convictions." *Armstrong v. State*, 1999 MT 261, ¶ 72, 296 Mont. 361, 989 P.2d 364.

¶85    Clifford and Huff also point out that if the Dignity Clause is to maintain its force as a shared public ethical norm,

> the substantive meaning of the clause must not be identified with, or justified by, any specific controversial religious or philosophical doctrines. The only reasonable political compromise we can reach in modern times (after the Reformation), when we must accept as fact that different segments of society will have deeply conflicting personal, religious, and philosophical views about how one ought to live one's life, is to agree to treat each other, and our respective values, with mutual respect and tolerance. This compromise makes possible the modern constitutional democracy, focused on securing the liberty and protecting the dignity of each person. Thus, the only conception of dignity that we can *all* share as citizens, despite our other differences, in a post-Reformation state (the conception of dignity that, for example, the delegates to the Constitutional Convention could share), must focus on honoring the worth of autonomous individuals. To remain consistent with this shared, public ideal of dignity, the right to treatment with dignity must not be defined according to some parochial, sectarian religious or some controversial, philosophical notion of human dignity—those richer conceptions of dignity about which we have agreed to disagree.

Clifford and Huff, 61 Mont. L. Rev. at 326-27 (footnote omitted).

¶86    Given its intrinsic nature, it is entirely proper, in my view, that the right of dignity under Article II, Section 4 is absolute. Indeed, human dignity transcends the Constitution and the law. Dignity is a fundamental component of humanness. It is inherent in human self-consciousness. Dignity belongs, intrinsically, to our species—to each of us—as a natural right from birth to death. It permeates each person regardless of who that person

46

is or what he does. It cannot be abrogated because of one's status or condition. While the government may impinge on privacy rights, liberty interests, and other Article II rights in proper circumstances (e.g., when one becomes a prisoner), the individual always retains his right of human dignity. So too with persons suffering from mental illness or disability and involuntary commitment: Each retains the right to demand of the State that his dignity as a human being be respected despite the government's sometimes necessary interference in his life.

¶87 I am convinced that each of us recognizes this intrinsic, elemental nature of human dignity. Indeed, that recognition explains why we collectively recoil from the pyramid of naked enemy soldiers prodded by troops with guns and dogs at Abu Ghraib; why disgust fills most of us at the descriptions and depictions of water boarding and torture; and why we revolt from ethnic cleansing and genocide. It is why we should collectively rebel, as well, when we see our fellow human beings in need from lack of food, clothing, shelter, medical care, and education.

¶88 Experience teaches, and we understand innately, that once we strip an individual of dignity, the human being no longer exists. A subhuman is easy to abuse, torture, and kill, because the object of the abuse is simply that—an object without worth or value and devoid of the essential element of humanness: dignity. Six million Jewish people, along with homosexuals, Gypsies, and persons with disabilities stand as mute testament to what happens when human beings are stripped of their dignity.

¶89   I believe this is why we also collectively recoil from accounts of our fellow human beings forced to endure the humiliation and degradation of an agonizing death from an incurable illness.[9]   Pain may, in theory, be alleviated to the point of rendering the person

---

[9] In this regard, twelve individuals who identify themselves as "surviving family members" submitted an amicus curiae brief with attached affidavits in support of the Patients. I note two of the stories here, though each story is compelling. These stories demonstrate that the State's "palliative care is the answer" argument has real limitations and grossly dehumanizing failures.

*Richard's Story*

First, one of the surviving family members describes the death of her longtime companion, Richard, who died of Lou Gehrig's disease:

> During the last two weeks of Richard's life, despite the conscientious efforts of his personal doctor, hospice nurses, and caregivers to provide comfort, he endured both physical and emotional pain of stunning magnitude. His mind was haunted by an acute awareness that his body was stiffening, becoming rigid, and rendering him immobile. He described a sense of being "stuck," "trapped," "chained to the bed," "tied down," "in prison." He suffered anxiety, panic attacks, and claustrophobia. In addition, he endured severe muscle spasms, frequent episodes of shortness of breath and the fear of suffocation, swallowing difficulty, and soreness of limbs.

Richard eventually stopped eating and drinking, went into a coma, and died shortly thereafter. Notably, before his death, Richard explored various death-with-dignity options but did not find a Montana doctor willing to aid him in this manner. Aff. Doris Fischer ¶¶ 3-6 (May 11, 2009).

*Betty's Story*

Second, another of the surviving family members describes the death of her sister, Betty, who died of multiple sclerosis:

> [T]he ravages Betty suffered from MS left her unable to simply hold a book and to turn its pages; she could no longer hold utensils with which to feed herself; she could no longer hold up her head and, therefore, spent all the waking hours of her day slouched with her chin resting on her chest, in her wheelchair. She was essentially paralyzed. Because swallowing was nearly impossible, she could choke while attempting to swallow even the slightest bit of liquid or puréed foods. Her body would endure terrible, even violent and uncontrollable spasms. One of those spasms actually

unconscious. But in those circumstances, we still cannot deny that the individual's human dignity has been dealt a grievous blow long before death claims her body. Indeed, in response to the State's argument that palliative care is a reasonable alternative to physician aid in dying, Mr. Baxter explained:

> I am appalled by this suggestion and the loss of personal autonomy it involves. I understand that terminal or palliative sedation would involve administering intravenous medication to me for the purpose of rendering me unconscious, and then withholding fluids and nutrition until I die, a process that may take weeks. During this final period of my life I would remain unconscious, unaware of my situation or surroundings, unresponsive from a cognitive or volitional standpoint, and uninvolved in my own death. My ability to maintain personal hygiene would be lost and I would be dependent on others to clean my body. My family would be forced to stand a horrible vigil while my unconscious body was maintained in this condition, wasting away from starvation and dehydration, while they waited for me to die. I would want to do whatever I could to avoid subjecting my family to such a painful and pointless ordeal.
>
> While the option of terminal sedation might be acceptable to some individuals – and I respect the right of others to choose this course if they wish to do so – it is abhorrent to me. The notion that terminal sedation should be the only option available to me if my suffering becomes intolerable is an affront to my personal values, beliefs and integrity. I have always been an independent and proud individual, and consider this form of medical treatment to be dehumanizing and humiliating. I feel strongly that my privacy, dignity and sense of self-autonomy will be forfeit if my life has to end in a state of terminal sedation.

---

> threw her from the confines of her wheelchair and resulted in a broken femur. Additionally, she had obscenely huge bed sores, as a result of her incapacity to move, as well as the fact that her body's protein was breaking down. . . . [T]hese bedsores were so large in some areas of her body that her bones were visible. It was an absolute nightmare for both of us – for her to bear, and for me to treat.

Betty made plans to move to Oregon, but she had to be hospitalized because of her broken femur. "She was painfully wasting away and was exhausted – beyond imagination." Although Betty was a stoic person, she often pleaded with her sister: "This is no life and I cannot stand it." She ultimately slipped into a coma and died shortly thereafter. Aff. Mary Fitzgerald ¶¶ 3-6 (May 12, 2009).

Supp. Aff. Robert Baxter ¶¶ 3-4 (Aug. 25, 2008).

¶90 Few of us would wish upon ourselves or upon others the prolonged dying that comes from an incurable illness. And it is for this reason that some of our fellow human beings demand—rightfully, in my view—that we respect their individual right to preserve their own human dignity at a time when they are mentally competent, incurably ill, and faced with death from their illness within a relatively short period of time.

¶91 The State asserts that it has compelling interests in preserving life and protecting vulnerable groups from potential abuses. This broad assertion, however, is entirely inadequate to sustain the State's position in opposition to physician aid in dying. We are dealing here with persons who are mentally competent, who are incurably ill, and who expect death within a relatively short period of time. The State has failed to explain what interest the government has in forcing a competent, incurably ill person who is going through prolonged suffering and slow, excruciating physical deterioration to hang on to the last possible moment. Moreover, the State has not come close to showing that it has any interest, much less a "compelling" one, in usurping a competent, incurably ill individual's autonomous decision to obtain a licensed physician's assistance in dying so that she might die with the same human dignity with which she was born. In point of fact, the State's position in this appeal is diametrically in opposition to the public policy reflected in the Montana Rights of the Terminally Ill Act: that a mentally competent, incurably ill individual should have autonomy with regard to end-of-life decisions and should be afforded respect and assurance that her life-ending wishes will be honored.

¶92 Furthermore, it must be remembered that an individual's right of human dignity is inviolable; it is incapable of being violated. Thus, there is absolutely no merit to the State's suggestion that it may strip a human being of his dignity in order to satisfy an interest that the government believes is "compelling." The right of dignity is absolute, and it remains absolute even at the time of death. It may not be stripped from the individual by a well-meaning yet paternalistic government. Nor may it be stripped by third parties or institutions driven by political ideology or religious beliefs. *Cf.* Clifford and Huff, 61 Mont. L. Rev. at 330 ("To be forced into degrading or dehumanizing pain or suffering because of someone else's conception of a good or proper death exacerbates the loss of dignity . . . ."). Dignity defines what it means to be human. It defines the depth of individual autonomy throughout life and, most certainly, at death. Usurping a mentally competent, incurably ill individual's ability to make end-of-life decisions and forcing that person against his will to suffer a prolonged and excruciating deterioration is, at its core, a blatant and untenable violation of the person's fundamental right of human dignity.

### III. CONCLUSION

¶93 In conclusion, while I join the Court's decision, I also would affirm the District Court's ruling on the constitutional issues. I agree with the Court's statutory analysis, but I also agree with Judge McCarter that physician aid is dying is firmly protected by Article II, Sections 4 and 10 of the Montana Constitution. Under these sections, individuals who are mentally competent and incurably ill and face death within a relatively short period of time have the right to self-administer, at a time and place of

their choosing, a life-ending substance prescribed by their physician. The physician simply makes the medication available to the patient who requests it and the patient ultimately chooses whether to cause her own death by self-administering the medicine.

¶94 This right to physician aid in dying quintessentially involves the inviolable right to human dignity—our most fragile fundamental right. Montana's Dignity Clause does not permit a person or entity to force an agonizing, dehumanizing, demeaning, and often protracted death upon a mentally competent, incurably ill individual for the sake of political ideology, religious belief, or a paternalistic sense of ethics. Society does not have the right to strip a mentally competent, incurably ill individual of her inviolable human dignity when she seeks aid in dying from her physician. Dignity is a fundamental component of humanness; it is intrinsic to our species; it must be respected throughout life; and it must be honored when one's inevitable destiny is death from an incurable illness.

¶95 I specially concur.

/S/ JAMES C. NELSON

Justice Jim Rice, dissenting.

¶96 The prohibition against homicide—intentionally causing the death of another—protects and preserves human life, is the ultimate recognition of human dignity, and is a

52

foundation for modern society, as it has been for millennia past. Based upon this foundation, Anglo-American law, encompassing the law of Montana, has prohibited the enabling of suicide for over 700 years. *Wash. v. Glucksberg*, 521 U.S. 702, 711, 117 S. Ct. 2258, 2263 (1997) (citations omitted). However, in contradiction to these fundamental principles, the Court concludes that physician-assisted suicide does not violate Montana's public policy. In doing so, the Court has badly misinterpreted our public policy: assisting suicide has been explicitly and expressly prohibited by Montana law for the past 114 years. More than merely setting aside the District Court's order herein, I would reverse the judgment entirely.

¶97 A flaw that underlies the Court's analysis is its failure to distinguish between the physician's basic intention in the assisted-suicide case from the physician's intention while rendering treatment in other cases. As developed further herein, the intentions in these two cases are diametrically opposed, and create the very difference between a criminal and noncriminal act. Physician-assisted suicide occurs when a physician provides a lethal drug with the *intent* to cause, when the drug is taken by the patient, the patient's death. With palliative care, the physician does not *intend* his or her actions to cause the patient's death, but rather intends to relieve the patient's pain and suffering. For this reason a physician providing palliative care, even in cases where the treatment arguably contributes to the patient's death, lacks the requisite mental state to be charged under homicide statutes. *Kan. v. Naramore*, 965 P.2d 211, 214 (Kan. App. 1998) (quoting Gordon & Singer, *Decisions and Care at the End of Life*, 346 Lancet 163, 165

53

(July 15, 1995)); *see also* §§ 45-5-102, -103, -104, MCA (2007). A similar distinction arises in the withholding or withdrawal of medical treatment that merely prolongs the dying process, pursuant to the Montana Rights of the Terminally Ill Act. Under the Act, a patient may refuse treatment and allow death to occur naturally, and physicians incur no liability, having not administered any death-causing treatment. Sections 50-9-103, -204, MCA.

¶98    Criminal acts may be defended on the basis of a victim's consent to the act in certain circumstances. Section 45-2-211(1), MCA. However, this statute makes consent "ineffective" if "it is against public policy to permit the conduct or the resulting harm." Section 45-2-211(2), MCA. The Court concludes from its review of Montana law that "it would be incongruous to conclude that a physician's indirect aid in dying is contrary to public policy." Opinion, ¶ 38. Because, generally, "the public policy of the State of Montana is set by the Montana Legislature through its enactment of statutes" *Duck Inn, Inc. v. Mont. State University-Northern*, 285 Mont. 519, 523-24, 949 P.2d 1179, 1182 (1997) (citations omitted), I turn to the very statutes which address the assisting of suicide.

### The Statutory Prohibition on the Aiding or Soliciting of Suicide

*"If the conduct of the offender made him the agent of the death, the offense is criminal homicide notwithstanding the consent or even the solicitations of the victim."*
~ Commission Comments, § 45-5-105, MCA.

¶99    Montana originally enacted a prohibition on the aiding or soliciting of suicide statute in 1895, providing that "[e]very person who deliberately aids, or advises or

54

encourages another to commit suicide is guilty of a felony." Section 698, Mont. Penal Code (1895). The prohibition on aiding suicide has been the formally enacted public policy of our state for the succeeding 114 years. Under the 1895 enactment, the death or survival of the victim was irrelevant, as the crime only required that a defendant deliberately aid, advise, or encourage another to commit suicide. The Legislature left the statute untouched for over seventy years.

¶100 In 1973, the Legislature revised the statute to read:

> (1) A person who purposely aids or solicits another to commit suicide, but such suicide does not occur commits the offense of aiding or soliciting suicide.

> (2) A person convicted of the offense of aiding or soliciting a suicide shall be imprisoned in the state prison for any term not to exceed ten (10) years.

Section 94-5-106, RCM (1973). The Legislature codified this provision within the homicide statutes. The current version of the statute is the same as the 1973 version, except that the Legislature has increased the potential punishment for the crime by authorizing a $50,000 penalty. Section 45-5-105(2), MCA (2007).

¶101 Under the wording of the current version of the statute, a person may be prosecuted for aiding or soliciting another to commit suicide only if the victim *survives*. The purpose of this change of the statutory language from the pre-1973 version was explained by the Criminal Code Commission that proposed it. When the victim *dies*, the act is to be prosecuted as a homicide. "If the conduct of the offender made him the agent of the death, the offense is *criminal homicide . . . .*" Commission Comments, § 45-5-105, MCA (emphasis added). The Commission Comments then direct attention to the other

55

crimes codified within the same homicide section—deliberate homicide, mitigated deliberate homicide, and negligent homicide. Commission Comments, § 45-5-105, MCA (citing §§ 45-5-102, -103, -104, MCA). Like the other homicide statutes, the statute prohibiting the aiding or soliciting of suicide makes the offense a felony. Sections 45-5-102(2), -103(4), -104(3), -105(2), MCA. The justification for the felony designation of the offense, despite the fact the victim has survived, was provided by the Commission: "The rationale behind the felony sentence for the substantive offense of aiding or soliciting suicide is that *the act typifies a very low regard for human life.*" Commission Comments, § 45-5-105, MCA (emphasis added). This clear statement of the State's policy to protect human life is steadfastly avoided by the Court in its analysis.

¶102 Thus, under Montana law, physicians who assist in a suicide are subject to criminal prosecution irrespective of whether the patient *survives* or *dies*. If the patient survives, the physician may be prosecuted under aiding or soliciting suicide. Section 45-5-105, MCA. If the patient *dies*, the physician may be prosecuted under the homicide statutes. Commission Comments, § 45-5-105, MCA (citing §§ 45-5-102, -103, -104, MCA).

¶103 Importantly, it is also very clear that a patient's consent to the physician's efforts is of no consequence whatsoever under these statutes. The Commission Comments explain that a physician acting as the agency of death may not raise "*consent or even the solicitations of the victim*" as a defense to criminal culpability. Commission Comments, § 45-5-105, MCA (emphasis added). This principle has likewise been stated and restated

by courts around the country: *Mich. v. Kevorkian*, 639 N.W.2d 291, 331 (Mich. App. 2001) ("consent and euthanasia are not recognized defenses to murder"); *Gentry v. Ind.*, 625 N.E.2d 1268, 1273 (Ind. App. 1st Dist. 1993) ("consent is not a defense to conduct causing another human being's death") (citation omitted); *Pa. v. Root*, 156 A.2d 895, 900 (Pa. Super. 1959) ("The Commonwealth is interested in protecting its citizens against acts which endanger their lives. *The policy of the law is to protect human life, even the life of a person who wishes to destroy his own. To prove that the victim wanted to die would be no defense to murder.*" (Emphasis added.)), *overruled on other grounds*, *Pa. v. Root*, 170 A.2d 310 (Pa. 1961).

¶104  The Court offers curious reasons for rejecting these clear and express statements of the State's public policy. Opinion, ¶ 39-42. It criticizes the citation to the Criminal Law Commission's Comments about the intent and the structure of the homicide statutes, despite the fact the Court has repeatedly used the Commission Comments in the application of our statutes. *See e.g. State v. Wooster*, 1999 MT 22, ¶ 34 n. 1, 293 Mont. 195, 974 P.2d 640; *State v. Hawk*, 285 Mont. 183, 187, 948 P.2d 209, 211 (1997); *State v. Shively*, 2009 MT 252, ¶ 17, 351 Mont. 513, 216 P.3d 732; *State v. Price*, 2002 MT 229, ¶ 18, 311 Mont. 439, 57 P.3d 42; *State v. Meeks*, 2008 MT 40, ¶ 9, 341 Mont. 341, 176 P.3d 1073. The Comments are critical here because they provide the intent behind and the interrelation among the homicide statutes—how they are designed to work together and the inapplicability of the defense of consent—and thus answer the specific question before the Court, an answer not made clear from the wording of the statutes themselves.

The reader should find it astonishing that, in this case only, involving an issue of life and death, the Court refuses to consider the Comments which stand in direct contradiction to its decision. Dispensing with the Comments allows the Court to construct an artificial artifice between the aiding suicide statute and the other statutes in the homicide section of the Criminal Code, when the clear intent was just the opposite—that there was to be no artifice.[1]

¶105 The Court then criticizes this Dissent as offering circular reasoning. Opinion, ¶ 43. The Court believes the Dissent is arguing that the consent statute is inapplicable merely because the conduct of physician-assisted suicide is defined as an offense and that such reasoning would obviate the consent statute for all offenses. However, the Court has misstated the Dissent. The consent statute is inapplicable, not simply because physician-assisted suicide is defined as illegal conduct, but because the intent of the Legislature was that the consent defense would not apply to this particular crime. Again, "[i]f the conduct of the offender made him the agent of the death, the offense is criminal homicide notwithstanding the consent or even the solicitations of the victim."

---

[1] If further demonstration of the propriety of consulting the Commission Comments is desired, the District Court's observations about the statute may be considered:

> The Court: I thought "How strange," but then I realized, thought later *maybe it's because* if the person does die, they aren't charged with assisted suicide, they'd be charged with a homicide.
>
> Mr. Johnstone: That's what my criminal Counsel, Ms. Anders, has told me.
>
> The Court: But it was really strange when I first ran across that. I had to read it ten times to figure that one out.

Hrg. Transcr. 63:3-12 (Oct. 10, 2008) (emphasis added).

Commission Comments, § 45-5-105, MCA. Application of the consent statute to other crimes is not affected by the Legislature's elimination of the consent defense for this particular crime. If this is circular or illogical, then the blame rests with the Legislature, because the only reasoning here offered by the Dissent is to point out the plain explanation of the working of the statutes. The Dissent has added nothing more. It is the Court who offers many words in an effort to reason away from this plain language and clear intent, when it is not our duty to agree or disagree with the Legislature's determination. "[T]his Court may not concern itself with the wisdom of such statutes" by arguing the Montana Legislature's logic is somehow circular or otherwise inappropriate. *Duck Inn, Inc.*, 285 Mont. at 523-24, 949 P.2d at 1182. The Court's role is simply to *find* the public policy. The homicide statutory framework and the prohibition against consent, by itself, is more than enough to foreclose any suggestion that Montana even remotely favors or supports physician-assisted suicide.[2] However, there is further evidence.

**The Montana Rights of the Terminally Ill Act**

¶106 In 1991, the Legislature enacted the Montana Rights of the Terminally Ill Act (Montana Act) by substantially adopting the Uniform Rights of the Terminally Ill Act (Uniform Act). Secs. 1-16, Ch. 391, L. 1991 (codified at §§ 50-9-101 to -206, MCA).

---

[2] The Court's approach is also disconcerting when considering the ambiguity this Opinion will bring for those who are not physicians. Physician assistants, nurse-practitioners, nurses, friends, and family do not qualify as physicians, but they will all undoubtedly be involved to varying degrees in the process of physician-assisted suicide. Yet, the Court's public policy reasoning is based upon the role of a physician. The net result of the decision, whether intended or not, is to leave "non-physicians" with the question of whether the decision premised upon a physician-based policy will apply to them as well.

59

The Prefatory Note in the Uniform Act explains that "[t]he scope of the Act is *narrow.* Its impact is limited to treatment that is merely *life-prolonging* . . . ."[3] Uniform Rights of Terminally Ill Act (1989), 9C U.L.A. 311, 312 (2001) (emphasis added). The form Declaration provided by the Montana Act for patients, by its plain language, further supports the scope of the purposes articulated in the Uniform Act:

> If I should have an incurable or irreversible condition that, without the administration of life-sustaining treatment, will, in the opinion of my attending physician or attending advanced practice registered nurse, cause my death within a relatively short time and I am no longer able to make decisions regarding my medical treatment, I direct my attending physician or attending advance practice registered nurse, pursuant to the Montana Rights of the Terminally Ill Act, *to withhold or withdraw treatment that only prolongs the process of dying and is not necessary to my comfort or to alleviate pain*.

Section 50-9-103(2), MCA (emphasis added). And, as the Court acknowledges, the Montana Act is careful to explain that it "does not condone, authorize, or approve mercy killing or euthanasia." Section 50-9-205(7), MCA.

¶107 The operative words in the Montana Act are those permitting a patient to "withhold" and "withdraw" life-sustaining treatment. *See* §§ 50-9-103(2), -106, -204,

---

[3] The quoted passage, in its entirety, is as follows:

> The scope of the Act is narrow. Its impact is limited to treatment that is merely life-prolonging, and to patients whose terminal condition is incurable and irreversible, whose death will soon occur, and who are unable to participate in treatment decisions. Beyond its narrow scope, the Act is not intended to affect any existing rights and responsibilities of persons to make medical treatment decisions. The Act merely provides alternative ways in which a terminally-ill patient's desires regarding the use of life-sustaining procedures can be legally implemented.

Uniform Rights of Terminally Ill Act (1989), 9C U.L.A. at 312.

-205, MCA.  Largely self-evident, to "withhold" means "to desist or refrain from granting, giving, or allowing." *Webster's Third New International Dictionary of the English Language* 2627 (Philip Babcock Gove ed., G. & C. Merriam Co. 1971). Similarly, "withdraw" is defined as "to take back or away (something bestowed or possessed)." *Webster's Third New International Dictionary of the English Language* at 2626.  Neither word incorporates the concept of affirmatively issuing a life-ending drug to a patient.  Rather, the plain language permits only the taking away of, or refraining from giving, certain medical treatment—that which merely prolongs the dying process. Sections 50-9-102(9), -103(2), -106, -204, -205, MCA.

¶108   Although the Court reasons that because the Montana Act permits the withholding or withdrawal of treatment prolonging the dying process, "it would be incongruous to conclude that a physician's indirect aid in dying is contrary to public policy," the opposite is true:  it is incongruous to conclude there is no legal distinction between the withdrawal of life-prolonging medical treatment and the provision of life-ending treatment.  This distinction is clearly recognized by the wording of our statutes, discussed above, and by the courts.  *See e.g. Vacco v. Quill*, 521 U.S. 793, 800, 808, 117 S. Ct. 2293, 2297-98, 2302 (1997) (distinguishing between physician-assisted suicide and refusal of medical treatment does not violate equal protection); and *compare Glucksberg*, 521 U.S. at 705-06, 117 S. Ct. at 2261 (holding there is no constitutional right to physician-assisted suicide) *with Cruzan v. Mo. Dept. of Health*, 497 U.S. 261, 277-79,

110 S. Ct. 2841, 2851-52 (1990) (assuming a constitutional right for competent person to refuse unwanted medical treatment).

¶109 To further illustrate the Legislature's policy preference in respecting a person's right to refuse medical treatment, Montana allows a person to forego cardiopulmonary resuscitation (CPR). Sections 50-10-101 to -107, MCA. To the extent a patient refuses the receipt of CPR, physicians must either refrain from conducting CPR or transfer the patient into the care of a physician who will follow the do not resuscitate protocol. Section 50-10-103(2), MCA. As with the Rights of the Terminally Ill Act, a person may refuse treatment, but the tenor of the statute provides no support for physicians shifting from idle onlookers of natural death to active participants in their patients' suicides.

¶110 Thus, the law accommodating a patient's desire to die of *natural* causes by withholding treatment does not, as the Court posits, support a public policy in favor of the deliberate action by a physician to cause a patient's *pre-natural*, or premature, death.

### *The 1972 Montana Constitution*

¶111 Montana's longstanding public policy against the assistance of suicide was continued by adoption of the 1972 Constitution. It supports neither the Court's public policy determination, nor the District Court's constitutionally based decision.

¶112 No statement concerning a "right to die" is included within the Constitution's Declaration of Rights. This absence is neither accidental nor the product of ignorance. In this regard, it is important to note that "[n]o proposal was adopted or rejected without

62

considered deliberation." Montana Constitutional Convention, Bill of Rights Committee Proposal, February 22, 1972, p. 618.

¶113    One of the proposals receiving such careful deliberation was Proposal No. 103. Montana Constitutional Convention, Minutes of the Bill of Rights Committee, February 9, 1972, p. 2. Submitted to the Bill of Rights Committee by Delegate Robert L. Kelleher, Proposal No. 103 would have included a right to die within the Constitution's Declaration of Rights. Montana Constitutional Convention, Delegate Proposals, February 2, 1972, p. 223.

¶114    Delegate Kelleher's proposal provided, in pertinent part, "The incurably ill have the right not to be kept alive by extraordinary means." Montana Constitutional Convention, Delegate Proposals, February 2, 1972, p. 223. Delegate Kelleher testified before the Bill of Rights Committee, "that the person with an incurable disease should have the right to choose his own death." Montana Constitutional Convention, Minutes of the Bill of Rights Committee, February 12, 1972, p. 5. Alternatives offered to Kelleher's proposal covered the broad spectrum of "right to die" scenarios. Joe Roberts testified on the same day as Delegate Kelleher, advocating for broader language: "There shall be a right to die. The legislature shall make appropriate provisions therefore." Montana Constitutional Convention, Minutes of the Bill of Rights Committee, February 12, 1972, p. 6; Montana Constitutional Convention, Testimony of Joe Roberts Before the Bill of Rights Committee Concerning the Right to Die, February 12, 1972, p. 4. Mr. Roberts referenced the "very poignant testimony" of witness Joyce Franks and her "personal

encounter with the agonizing death of her father." Montana Constitutional Convention, Testimony of Joe Roberts Before the Bill of Rights Committee Concerning the Right to Die, February 12, 1972, p. 1. Ms. Franks' testimony had described the death of her 86-year-old father and his wish that a doctor "give him something to put him to sleep right then." Montana Constitutional Convention, Testimony of Joyce M. Franks Before the Bill of Rights Committee, February 3, 1972, p. 5A. Ms. Franks stated to the Bill of Rights Committee, "What I am working for is that every person shall have the right to determine, barring accident, the manner of his dying. And then, I am advocating the twin right to make it legal, if he desires this type of death, for a person to receive a quick and easy medicated death somehow." Montana Constitutional Convention, Testimony of Joyce M. Franks Before the Bill of Rights Committee, February 3, 1972, p. 1. Ms. Franks therefore urged adoption of an amendment stating: "Every citizen shall be allowed to choose the manner in which he dies." Montana Constitutional Convention, Testimony of Joyce M. Franks Before the Bill of Rights Committee, February 3, 1972, p. 2; *see also* Charles S. Johnson, *Right to Die Resurfaces in Montana*, Independent Record F1 (Aug. 23, 2009) (describing Constitutional Convention's consideration and rejection of a right to die).

¶115 However, the Bill of Rights Committee rejected Kelleher's proposal in its entirety and also rejected all of the alternatives which had been offered in conjunction with Kelleher's proposal to incorporate a "right to die" of any kind within the new

Constitution. *See* Montana Constitutional Convention, Minutes of the Bill of Rights Committee, February 9, 1972, p. 2.

¶116 Nor were other provisions of the Constitution, such as the Individual Dignity and the Right of Privacy provisions, drafted to include a right to die. The Constitutional Convention adopted the Individual Dignity Section for the express purpose of providing equal protection and prohibiting discrimination. The Bill of Rights Committee proposed the Individual Dignity Section "with the *intent* of providing a Constitutional impetus for the eradication of public and private discriminations based on race, color, sex, culture, social origin or condition, or political or religious ideas." Montana Constitutional Convention, Bill of Rights Committee Proposal, February 22, 1972, p. 628 (emphasis added). During the floor debate on the provision, Delegate Otto Habedank expressed concern that he would be required "to associate with people that I choose not to associate with." Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1643. Delegate Wade J. Dahood, Chairman of the Bill of Rights Committee, responded to Delegate Habedank's concern by stating, "There is no intent within this particular section to do anything other than to remove the apparent type of discrimination that all of us object to with respect to employment, to rental practices, to actual association in matters that are public or matters that tend to be somewhat quasi-public." Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1643. Delegate Dahood's statement was consistent with the expressed intent of the Bill of Rights Committee Proposal, which was, in consideration of the entirety of Article II, Section 4,

to provide "a Constitutional impetus for the eradication of public and private discriminations . . . ." *See* Montana Constitutional Convention, Bill of Rights Committee Proposal, February 22, 1972, p. 628; Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1643. Nothing within these discussions or explanations suggests even a thought that the dignity clause contained vague, lurking rights that might someday manifest themselves beyond what the delegates or the citizens of Montana who approved the Constitution believed, and overturn long-established law, here, the policy against assisted suicide. The reference to dignity therefore provides an aspirational introduction to the already well-established substantive legal principles providing the operative vehicles to achieve dignity: equal protection and the prohibition upon discrimination.[4] Likewise, the right to privacy did not alter the State's policy against assisted suicide. There is nothing within either the language of the provision or the convention proceedings which would reflect any such intention. *See e.g.* Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, pp. 1680-82; Montana

---

[4] The historical origins of the dignity clause are enlightening. At the Constitutional Convention, delegates reviewed two foreign constitutions, the 1949 West Germany Constitution and the 1951 Puerto Rico Constitution. Montana Constitutional Convention Commission, *Constitutional Convention Studies No. 10: Bill of Rights* 242 (1972); Montana Constitutional Convention, Bill of Rights Committee Proposal, February 22, 1972, p. 628. The West German Constitution, the eldest of the two, provided, "The dignity of man shall be inviolable." Montana Constitutional Convention Commission, *Constitutional Convention Studies No. 10: Bill of Rights* at 242 (citing West German Const. art. I). The Montana Constitution contains the identical provision, adopted word-for-word except for the use of the gender-neutral "human being" instead of "man." The West German Constitution was developed in response to the Nazi regime's unequal treatment, persecution, and ultimate killing of the Jewish people. *See e.g.* Gregory H. Fox & Georg Nolte, *Intolerant Democracies*, 36 Harv. Intl. L.J. 1, 32 (1995); George J. Annas, *The Man on the Moon, Immortality, and other Millennial Myths: The Prospects and Perils of Human Genetic Engineering*, 49 Emory L.J. 753, 758-59 (2000).

Constitutional Convention, Bill of Rights Committee Proposal, February 22, 1972, pp. 632-33. For such reasons, not one court of last resort has interpreted a constitutional right of privacy to include physician-assisted suicide. *Kirscher v. McIver*, 697 So. 2d 97, 100, 104 (Fla. 1997); *Sampson v. Alaska*, 31 P.3d 88, 98 (Alaska 2001); *Glucksberg*, 521 U.S. at 705-06, 117 S. Ct. at 2261. No evidence exists that the delegates intended the right of privacy to change the state's longstanding public policy. Since adoption of the 1972 Constitution, the Legislature has continued to enact legislation prohibiting assisted suicide. Indeed, the Legislature directed the Department of Public Health and Human Services to "implement a suicide prevention program by January 1, 2008," including a plan that must delineate "specific activities to reduce suicide." Sections 53-21-1101(1), -1102(2)(b), MCA. This is further indication of a state public policy against assisted suicide.

¶117 Because we live in a democracy, this policy may someday change. Controlling their own destiny, Montanans may decide to change the State's public policy after what would be, no doubt, a spirited public debate. In fact, efforts in that regard have already started. *See e.g.* Bill Draft LC1818, 61st Leg., Reg. Sess. (Jan. 9, 2008) (The proposed "Montana Death with Dignity Act" had the stated purpose of "allowing a terminally ill patient to request medication to end the patient's life."). This Court should allow the public debate to continue, and allow the citizens of this State to control their own destiny on the issue.

¶118 Until the public policy is changed by the democratic process, it should be recognized and enforced by the courts. It is a public policy which regards the aiding of suicide as typifying "a very low regard for human life," Commission Comments, § 45-5-105, MCA, and which expressly prohibits it. Instead, the Court rejects the State's longstanding policy. It ignores expressed intent, parses statutes, and churns reasons to avoid the clear policy of the State and reach an untenable conclusion: that it is *against* public policy for a physician to assist in a suicide if the patient happens to *live* after taking the medication; but that the very same act, with the very same intent, is *not* against public policy if the patient *dies*. In my view, the Court's conclusion is without support, without clear reason, and without moral force.

¶119 I would reverse.

/S/ JIM RICE

Hon. Joe L. Hegel, District Court Judge, sitting in place of Chief Justice Mike McGrath, joins in the dissenting Opinion of Justice Jim Rice.


/S/ JOE L. HEGEL
Honorable Joe L. Hegel, District Judge